

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 11, 2012

**BY FACSIMILE**
The Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007
FAX: (212) 805-0426

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: OCT 2 2 2012
```

Re: United States v. William Landberg, 10 Cr. 538 (LTS)

Dear Judge Swain:

As requested at the conference held in the above-referenced matter on July 12, 2012, the Government respectfully writes to notify the Court of its position with respect to the identification of victims in this matter. Specifically, the Court asked that the parties confer and clarify their joint or respective views with respect to which individuals and/or entities should be viewed by the Court as victims. The identification of specific victims impacts several issues, including: (i) which individuals and/or entities have a right to be reasonably heard in connection with the sentencing in this case; (ii) which individuals may be entitled to restitution in connection with the criminal conduct in this case; and (iii) the calculation of the applicable Sentencing Guidelines range. The defendant is scheduled to be sentenced on October 25, 2012, at 3:00 p.m.

### A. Applicable Law

The Crime Victims' Rights Act, Title 18, United States Code, Section 3771 (the "CVRA"), confers certain rights on the victims of crimes, including the right to be notified of public court proceedings and the right to be reasonably heard at sentencing proceedings. 18 U.S.C. § 3771(a). The CVRA also provides that victims have a right to "full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). In connection with this case, the statutes that govern restitution awards include the Victim and Witness Protection Act of 1982, Title 18, United States Code, Section 3663 (the "VWPA"), and the Mandatory Victim Restitution Act of 1986, Title 18, United States Code, Section 3663A (the "MVRA").[1] The CVRA, VWPA and

---

[1] The plea agreement pursuant to which the defendant entered a guilty plea specifies, in relevant part, that "Landberg shall make restitution in an amount to be specified by the Court in accordance with 18 U.S.C. §§ 3663, 3663A and 3664."

Honorable Laura Taylor Swain
October 11, 2012
Page 2 of 9

MVRA all define a "victim" as "a person directly and proximately harmed as a result of the commission of [the] offense." 18 U.S.C. § 3771(e); 18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2). Both the VWPA and MVRA further state that "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," a victim also includes "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2).[2]

Proximate cause requires "some direct relationship between the injury asserted and the injurious conduct alleged." Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992). The requirement that the victim be "directly and proximately harmed" encompasses the traditional "but for" and proximate cause analyses. United States v. Murillo-Bejerano (In re Rendon Galvis), 564 F.3d 170, 175 (2d Cir. 2009). "Although the definition of victim is certainly broad, in determining whether one qualifies as a victim, a sentencing court can only consider the offense or offenses for which the defendant was convicted." United States v. Battista, 575 F.3d 226, 231 (2d Cir. 2009) (assessing whether entity constituted a victim for purposes of the VWPA); see also Hughey v. United States, 495 U.S. 411, 413, 420 (1990) ("[T]he loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order."); United States v. Archer, 671 F.3d 149, 170 (2d Cir. 2011) ("the district court's statutory authority to award restitution under the MVRA is limited to awards to victims of the offense of conviction"); In Re Local # 46 Metallic Lathers Union, 568 F.3d 81, 85 (2d Cir. 2009) (same); United States v. Oladimeji, 463 F.3d 152, 158-59 (2d Cir. 2006) (holding that the relevant question in imposing restitution under the MVRA is whether the "loss [is] caused by the specific conduct that is the basis of the offense of conviction").[3]

---

[2] The provisions of the VWPA and the MVRA are "nearly identical in authorizing an award of restitution." United States v. Battista, 575 F.3d 226, 230 (2d Cir. 2009) (citation omitted). The principal distinction between the two statutes is that under the MVRA, restitution is mandatory for certain crimes, while under the VWPA, restitution is discretionary and the court must consider "the amount of the loss sustained by the victim as a result of the offense, the defendant's financial resources, the financial needs and earning ability of the defendant and the defendant's dependents, and other factors the court deems appropriate." Id. As noted in footnote 1 above, pursuant to his plea agreement with the Government, the defendant has agreed to make restitution in an amount specified by the Court pursuant to both of these statutes.

[3] In United States v. Boyd, 222 F.3d 47 (2d Cir. 2000), the Second Circuit observed that in enacting certain amendments to the VWPA, Congress "broadened the scope of restitution from losses attributable solely to the offense of conviction to all losses caused in the course of a defendant's criminal conduct, whether the defendant is convicted of each of those offenses or not." Id. at 50 (citing United States v. Collins, 209 F.3d 1, 3 (1st Cir. 1999)). In Boyd, the specific question presented was whether the defendant could be required to make restitution to all victims of a conspiracy whose losses were based in part on acts by other co-conspirators (which

Honorable Laura Taylor Swain
October 11, 2012
Page 3 of 9

### B. The Offense Conduct

At issue in this case is Landberg's fraudulent procurement in early 2009 of three loans from a German bank, WestLB, purportedly to fund mortgage loans in connection with the West End/Mercury Short Term Mortgage Fund LP (the "Hard Money Fund"). Once he obtained the loans, Landberg diverted the West LB funds for other uses, including to benefit himself and investors in other West End funds. Landberg did not inform the investors who contributed funds to the Hard Money Fund in early 2009 that he had misappropriated the funds advanced from West LB.

According to a private placement memorandum issued by the Hard Money Fund to investors in or about December 2007, the stated objective of the Hard Money Fund was to "achieve short term, high-yield interest income through making, servicing, purchasing, selling and repurchasing and purchasing and selling participation in, mortgage loans" (the "Mortgage Loans"). All Mortgage Loans would originate with, and be serviced by, a mortgage servicing company. The Hard Money Fund private placement memorandum further stated that the Hard Money Fund would sell mortgage loans on particular properties to MCC Funding, Inc. ("MCC Funding"), a wholly owned subsidiary of the Hard Money Fund. MCC Funding would purchase the Mortgage Loans using capital contributions made to MCC Funding by the Hard Money Fund, as well as principal and interest advances it received from West LB, pursuant to a Credit and Security Agreement between West LB and MCC Funding. In consideration for its principal and interest advances, West LB received the Mortgage Loans as collateral for the fund advances from MCC Funding. Hard Money Fund offering materials provided to investors in early 2009 specifically stated that money borrowed from West LB would only be used to fund investments made by the Hard Money Fund.

As a result of the charged conduct, Landberg fraudulently obtained approximately $8.6 million as follows:

---

acts were contained in substantive charges naming those co-conspirators and not the defendant). The Second Circuit held that "the VWPA confers authority to order a participant in a conspiracy to pay restitution even on uncharged or acquitted counts." Id. at 51. The holding in Boyd was based on certain factors specific to criminal conspiracies, including that the jury, by virtue of finding the defendant guilty, had necessarily made the relevant findings that the defendant was a member of the conspiracy, that her offense was committed pursuant to the common plan of the conspiracy, and that she could reasonably have foreseen that a co-conspirator would commit the substantive offense. Id. "Neither Boyd nor any other case, however, holds that a defendant can be required to pay restitution for losses caused by acquitted or uncharged conduct that extends beyond the 'scheme, conspiracy, or pattern of criminal activity' included 'as an element' of the offense of conviction." United States v. Lisa, 152 Fed. Appx. 85, 87 (2d Cir. 2005) (quoting 18 U.S.C. § 3663A(a)(2)).

Honorable Laura Taylor Swain
October 11, 2012
Page 4 of 9

On or about January 23, 2009, Landberg submitted a request to West LB on behalf of the Hard Money Fund for advance funding in the amount of $3.948 million. Landberg represented to West LB that the Hard Money Fund would use this money to fund a loan to develop real property on Long Island (the "Benedek Loan"). However, upon receiving the $3.948 million loan on or about January 27, 2009, Landberg misappropriated most of the money and used it for the benefit of other funds and for himself. He used approximately $2 million of the loan proceeds to fund commitments of the Franchise Fund, paid approximately $350,000 to investors as purported earnings on their investments and diverted over $100,000 to his own personal accounts.

In or about February 2009, Landberg again fabricated a loan transaction in order to obtain West LB funds. Specifically, on or about February 27, 2009, Landberg signed an advance funding request for approximately $3.080 million for a loan purportedly relating to a property located in Florida (the "Fruitville Loan"). Landberg caused the funding request to be submitted by West End to West LB, which wired the funds on or about March 2, 2009. Landberg then used the approximately $3.080 million advanced by West LB for purposes other than those represented in the advance form requests and not permitted by agreements between West LB and MCC Funding.

On or about April 7, 2009, Landberg signed an advanced funding request for approximately $1.6 million for a loan relating to property located in Alabama (the "Ashley Furniture Loan"). Landberg caused the funding request to be submitted to West LB, which wired the monies on or about April 17, 2009. Again, Landberg used the approximately $1.6 million advanced by West LB for purposes other than those represented in the advance form requests and not permitted by agreements between West LB and MCC Funding. Thereafter, Landberg failed to inform West LB that the loan transaction did not close and failed to return the monies to West LB as required.

The three loan transactions described above were structured so that West LB would put up approximately 80% of the money, with the remaining approximately 20% to come from the monies invested in the Hard Money Fund by West End investors. In part because the loan structure contemplated this participation by investors in the Hard Money Fund, money contributed by those investors was necessarily put at risk as a result of Landberg's fraudulent scheme. Additionally, Hard Money Fund investors would not have contributed any funds to West End had they known that Landberg would engage in this fraudulent loan scheme and falsely represent the manner in which both the West LB and the Hard Money Fund monies would be used.

C. **Discussion**

Based on the information presently available to the Government, the ascertainable individuals and/or entities who were "directly and proximately harmed" by Landberg's

Honorable Laura Taylor Swain
October 11, 2012
Page 5 of 9

fraudulent obtaining of the three specific loans identified above include: (1) West LB, which advanced the approximately $8.6 million to West End in reliance on Landberg's fraudulent representations, and (2) those individuals who invested in or made contributions to the Hard Money Fund (either directly or indirectly as described in further detail below) in the time period in early 2009 during which Landberg obtained the above-described loans. Through these three fraudulently obtained loans, Landberg defrauded both West LB and West End Hard Money Fund investors by submitting advance funding requests to West LB and falsely representing the manner in which those funds would be used. The Government has reviewed investor statements of account prepared by West End Financial Advisors LLC in or about September 2010, and as a result has identified the individuals in category (2) above to be the following:

| Investor Initials | Date(s) of Investment | Amount Invested | Fund | Loss Amount |
|---|---|---|---|---|
| M.B./K.B. | 2/27/2009 | $250,000 | Income Strategies | $75,000 |
| R.C. | 4/9/2009 | $200,000 | Income Strategies | $50,000 |
| C. Trust | 3/15/2009 | $500,000 | Income Strategies | $150,000 |
| D.C. | 1/28/2009 | $188,000 | Income Strategies | $56,400 |
| C.C. | 4/13/2009 | $100,000 | Income Strategies | $30,000 |
| D.E. | 3/31/2009 | $50,000 | Income Strategies | $15,000 |
| H.G. | 1/14/2009<br>1/14/2009 | $20,000<br>$80,000 | Income Strategies<br>Income Strategies | $20,000 |
| R.H. | 2/17/2009 | $25,000 | Hard Money | $25,000 |
| R.H. | 2/9/2009<br>3/9/2009 | $280,600<br>$200,000 | Income Strategies<br>Hard Money | $274,180 |
| F.H. | 3/23/2009<br>3/25/2009 | $730,000<br>$270,000 | Income Strategies<br>Income Strategies | $300,000 |
| G.H. | 4/9/2009 | $100,000 | Income Strategies | $30,000 |
| R.J. | 2/25/2009 | $100,000 | Income Strategies | $30,000 |
| H.P. | 4/22/2009 | $45,000 | Income Strategies | $13,500 |
| A.R. | 2/3/2009 | $350,000 | Income Strategies | $105,000 |

Honorable Laura Taylor Swain
October 11, 2012
Page 6 of 9

| Investor Initials | Date(s) of Investment | Amount Invested | Fund | Loss Amount |
|---|---|---|---|---|
| M.R. | 1/13/2009<br>2/20/2009<br>3/27/2009<br>4/1/2009<br>4/9/2009<br>4/13/2009<br>4/22/2009 | $100,000<br>$50,000<br>$50,000<br>$118,900<br>$100,000<br>$50,000<br>$50,000 | Hard Money<br>Hard Money<br>Hard Money<br>Income Strategies<br>Income Strategies<br>Income Strategies<br>Income Strategies | $254,170 |
| M.R. | 3/24/2009<br>4/9/2009 | $50,000<br>$100,000 | Hard Money<br>Income Strategies | $80,000 |
| P.R. | 2/13/2009 | $434,680 | Income Strategies | $130,404 |
| D.S. | 1/27/2009 | $100,000 | Income Strategies | $29,000 |
| P.T./L.T. | 1/13/2009<br>1/23/2009<br>2/27/2009<br>3/4/2009<br>3/11/2009<br>3/19/2009<br>3/30/2009<br>4/9/2009<br>4/13/2009<br>4/24/2009 | $100,000<br>$50,000<br>$100,000<br>$260,000<br>$100,000<br>$250,000<br>$150,000<br>$100,000<br>$50,000<br>$50,000 | Hard Money<br>Hard Money<br>Income Strategies<br>Income Strategies<br>Hard Money<br>Hard Money<br>Hard Money<br>Income Strategies<br>Income Strategies<br>Income Strategies | $770,000 |
| R.W./S.C. | 3/23/2009 | $150,000 | Income Strategies | $45,000 |

Accordingly, it is the Government's position that the victims of the criminal conduct charged in this case include West LB and the 20 individual investors identified above.[4] In the Government's

---

[4] As discussed on the record during the conference on July 12, 2012, because the Government understands that the Court intends to docket this letter so that it is publicly available, and because certain investors may not wish their full names to be included in such a public document, the 20 investors are identified herein by their initials as well as their investment date(s) and amount(s). To the extent there is any confusion or uncertainty about which individuals are referenced herein, the Government is happy to address those questions on an individual basis. In addition, West LB is not included in the table contained above, and accordingly no loss amount is listed for West LB, because it is the Government's understanding

view, therefore, West LB and the above individual investors have a right reasonably to be heard in connection with the sentencing of this matter under the CVRA,[5] and further may receive restitution for their losses pursuant to Sections 3663, 3663A and 3664.

The loss amount that appears in the column labeled "Loss Amount" above was calculated in one of two ways depending on the fund into which the investment was initially directed. For those investments that were direct investments into the Hard Money Fund, the loss amount was calculated by offsetting the amount(s) of investor contribution(s) to the Hard Money Fund in early 2009 by any disbursements of funds from the Hard Money Fund in early 2009. The calculation of the loss amount for those investments in the Income Strategies Fund are more complex. The Income Strategies Fund was a feeder fund, which effectively channeled investor contributions into the Hard Money Fund and the Franchise Fund. Until as recently as August 15, 2012, it had been the Government's understanding that the apportionment of investor contributions between these two funds was done on an ad hoc basis, and that it was not possible to determine the proportion of investor contributions into the Income Strategies Fund that ultimately went into the Hard Money Fund (as opposed to the Franchise Fund), and thus that were directly implicated in the charged fraud in this case.[6] After further consultation with the General Counsel and Managing Member of West End Financial Advisors, LLC, as well as the review of pertinent bank records, it is the Government's understanding that investor contributions into the Income Strategies Fund were split approximately 70% / 30% between the two funds, with approximately 30% of each contribution going into the Hard Money Fund. Accordingly, in order to calculate the loss amount for these investments, the Government has

---

that West LB has been fully compensated for the three loans it extended through a negotiated arrangement which involved, in part, the surrender of a property by the defendant and/or his family members.

[5] It was the Court's receipt of numerous victim impact statements from individual investors that necessitated the clarification of the parties' positions with respect to the victims of the offense in this case. While other individual investors may not have a statutory right reasonably to be heard in connection with the sentencing in this matter pursuant to the CVRA, the Court of course may consider the statements of other investors in making its sentencing determination to the extent relevant to the sentencing factors enumerated in Title 18, United States Code, Section 3553(a). See also Title 18, United States Code, Section 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

[6] The distinction ends up being particularly important in connection with the fraudulent loans at issue in this case, because the defendant used a significant portion of the fraudulently obtained loans for the benefit of the Franchise Fund.

Honorable Laura Taylor Swain
October 11, 2012
Page 8 of 9

calculated 30% of the amounts of investor contributions in early 2009, and subtracted from that amount any disbursements of funds to investors from the Income Strategies Fund in 2009. The Government believes that these calculations of loss amounts constitute "reasonable estimates" of the victims' actual losses. See United States v. Germosen, 139 F.3d 120, 129-30 (2d Cir. 1998).

There are certain complicating factors present in this case that arguably impact the determination of which West End investors are appropriately viewed as victims of the defendant's criminal offense of conviction, and further that help to explain the significant number of letters from investors the Court has received. Two different forensic accounting firms that were tasked (in connection with a pending Bankruptcy Court proceeding and also pursuant to the request of the current General Counsel and Managing Member of West End Financial Advisors, LLC) with examining the books and records of the West End entities following the discovery of the defendant's fraud concluded both that the books and records were not consistently and reliably maintained and that the commingling of funds between and among the various West End investment vehicles was so extensive as to make it impossible reliably to follow the money invested by specific investors to the fund and/or account into which it was ultimately deposited. In addition, it appears that monies from certain West End funds were moved between and among entities, without notice to investors, in order to cover shortfalls or capital requirements as they arose in other West End funds. For this reason, it is entirely possible that money invested by individuals in other West End entities (either in early 2009 or before) was moved without their knowledge into the Hard Money Fund, and was there as of early 2009 during the time period relevant to the charged fraud. Conversely, it is also possible that the money invested in the Hard Money Fund in 2009, either directly or indirectly as discussed above, was immediately or very shortly thereafter moved into the accounts of other West End entities. The MVRA explicitly recognizes that there may be circumstances in which factual issues relating to restitution determinations are so "complex" that the burden on the sentencing process outweighs the need to provide restitution to particular victims. 18 U.S.C. § 3663A(c)(3)(B). In this case, while it would be ideal to identify all investors whose contributed monies ultimately ended up in the Hard Money Fund as of early 2009, it is the Government's present understanding that it is not only complex, but in fact is not possible to ascertain who those investors are in any reliable fashion.

In addition, it is the Government's understanding that much of the money invested in the West End funds by individual investors is now no longer available to them, either because of a failed investment strategy or strategies, changes in the market, misappropriation or misuse of funds, or a combination of all of these factors. We believe this is also a contributing factor to the large number of letters the Court has received. However, the criminal conduct charged in this case was limited to the three fraudulently obtained loans identified above, and does not extend to any other conduct that may have given rise to losses to the West End investors as a group.

Despite the commingling of funds, which makes any attempt to determine the investor

victims and their specific losses imperfect, the Government believes that the investors properly identified as victims in this case are West LB and the twenty individuals who directly or indirectly invested in the Hard Money Fund during the time frame of the criminal scheme charged. These individuals invested their money with a specific understanding of how it would be used and with no knowledge that Landberg was instead at that time fraudulently obtaining loans from West LB.

The Government will work with the Probation Department to ensure that all information concerning the victims in this case and the calculation of their loss amounts is provided and/or obtained in a timely fashion.

The Government provided a copy of this letter in draft form to defense counsel on August 22, 2012. Since that time, the Government and defense counsel have discussed the position taken in the draft letter (which does not differ from that contained herein). It is the Government's understanding that the defendant does not agree that the individual investors identified in the table above are properly considered victims of the criminal conduct at issue in this case, and further disputes the loss amounts calculated by the Government. On September 6, 2012, defense counsel submitted a lengthy discovery request to the Government related to these matters. The Government has provided to the defense all of the requested materials that are currently in its possession, and believes that those materials adequately support the position taken in this letter. Several of the defendant's discovery requests concern the management of the West End entities after Landberg's departure in the Spring of 2009, and the Government is not in possession of the requested materials. The Government understands that defense counsel intends to seek an adjournment of the current sentencing date. While the Government appreciates that a brief adjournment may be warranted in light of the longer than anticipated passage of time between the July 12 conference and the submission of this letter, and also in order to give defense counsel an opportunity to review the discovery materials provided, the Government does not believe that sentencing should be delayed for an extended period of time.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _Jenna M. Dabs_

Jenna M. Dabbs
Assistant United States Attorney
Tel.: (212) 637-2212

cc: Michael Bachner, Esq. (by e-mail)
Colleen Tyler, United States Probation Officer (by e-mail)